UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| TOWER MANUFACTURING CORPORATION, Plaintiff, | : | |
| v. | : | CA 06-170 S |
| SHANGHAI ELE MANUFACTURING CORPORATION, Defendant. | : | |

**REPORT AND RECOMMENDATION**
**(REDACTED)**[1]

David L. Martin, United States Magistrate Judge

Before the Court is Defendant Shanghai ELE Manufacturing Corporation's Motion to Dismiss for Lack of Personal Jurisdiction (Document ("Doc.") #13) ("Motion to Dismiss" or "Motion"). The Motion has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). A hearing was conducted on November 21, 2007. For the reasons stated herein, I recommend that the Motion be denied.

## Introduction

This is an action for patent infringement. See Complaint (Doc. #1) ¶ 3. Plaintiff Tower Manufacturing Corporation

---

[1] Plaintiff Tower's Memorandum in Support of Objection to Defendant's Motion to Dismiss for Lack of Personal Jurisdiction ("Tower Mem.") was filed under seal, apparently because it contained (or referenced) sales information obtained from third parties, and these third parties designated some or all of the sales information which they provided as confidential. While the Court has doubts whether its discussion of this sales information requires a similar protective measure, out of an abundance of caution this Report and Recommendation is being issued in a redacted and an unredacted version. The confidential sales information appears only in the unredacted version and is italicized. The parties are not to disseminate the unredacted version to a non-party without authorization from the Court.

("Plaintiff" or "Tower"), a Rhode Island corporation, alleges that Defendant Shanghai ELE Manufacturing Corporation ("Defendant" or "ELE"), a Chinese corporation, is infringing a patent to which Tower holds the rights, Letters Patent No. 6,738,241 B1 ("the '241 Patent"). See id. ¶¶ 1-3, 9, 11. Specifically, Tower complains that ELE is infringing by making and selling leakage current detection interrupters ("LCDIs")[2] which are covered by the claims of the '241 Patent. Id. ¶ 11.

**Facts**

Tower has places of business in Providence, Rhode Island, and Shenzhen, China, and manufactures wiring devices and electromechanical products, including LCDI products. See Declaration of Tony D. Chen in Support of Shanghai ELE Manufacturing Corporation's Motion to Dismiss for Lack of Personal Jurisdiction ("Chen Decl."), Exhibit ("Ex.") A (Printout of pages from Tower's website) at 1-2. ELE has its headquarters in Shanghai, China, with manufacturing facilities in Jiangsu and Zhejiang Provinces, China. See Declaration of Long Zhang ("Zhang Decl.") ¶ 2. ELE manufactures household electrical products, two of which, LCDIs and Ground Fault Circuit Interruption ("GFCI") devices, are imported and/or sold in the United States. See id. ¶¶ 2, 10. Tower's claim of infringement is directed only at the LCDIs manufactured by ELE. See Complaint ¶ 11.

Most of the LCDIs made by ELE are sold to air conditioner

---

[2] A leakage current detection interrupter ("LCDI") is an electrical safety device which is designed to prevent household fires caused by current leaking through a damaged power cord. See Tower Mem. at 2-3. LCDIs are an integral component of the plug and cord sets found on air conditioners. See id. In 2004, Underwriters Laboratories ("UL"), a U.S. product safety and certification organization, mandated that all air conditioners sold in the United States include an LCDI device. See id. at 3.

manufacturers located in China.[3] See Zhang Decl. ¶ 15. The manufacturers assemble their air conditioner products with LCDIs as a component part. See Zhang Decl. ¶ 15. The air conditioners are then exported to and sold in the United States. See id. A lesser number of LCDIs are sold directly to manufacturers located in the United States. See Declaration of Kenneth X. Xie ("Xie Decl.") ¶¶ 16-19. The approximate value of an LCDI is about $4.00. See Zhang Decl. ¶ 16.

---

[3] ELE filed a declaration from its Chief Executive Officer, Long Zhang, dated November 16, 2006, which implied that all of its LCDIs are sold to air conditioner manufacturers located in China. See Declaration of Long Zhang ("Zhang Decl.") ¶ 15. The declaration specifically stated in two places that ELE had never sold any LCDIs in the United States, see id. ¶¶ 10, 32. These statements were, at the very least, inaccurate.

ELE had been selling LCDIs directly to manufacturers in the U.S. for more than four months. See Declaration of Kenneth X. Xie ("Xie Decl."), Exhibit ("Ex.") O (Friedrich Air Conditioning Co./Shanghai ELE LCDI Invoices), Ex. Q (Purchase Order Acknowledgment). In fact, as of the date Zhang signed his declaration, ELE had sold at least [REDACTED] LCDIs to two U.S. manufacturers, the Friedrich Air Conditioning Co. ("Friedrich") of San Antonio, Texas, and Fedders Islandaire, Inc. ("Fedders Islandaire"), of East Setauket, New York, resulting in revenue of at least [REDACTED]. See id. There had also been at least six separate shipments of LCDIs directly to the U.S. See id. ELE's sales manager at the time, Barkley Bao, had communicated repeatedly with Friedrich regarding sales of LCDIs. See id., Ex. I (Emails between Bao and Mintz). Most strikingly, in an August 21, 2006, email to Friedrich, Bao refers to "our US cusotmers [sic] ...," id. at 1.

ELE did not notify the Court of the misstatements in Zhang's declaration, nor has it offered any explanation for them. Even more troubling, ELE's counsel repeatedly stated in their initial memorandum that ELE had not made any direct sales of LCDIs to U.S. manufacturers. See Memorandum in Support of Defendant Shanghai ELE Manufacturing Corporation's Motion to Dismiss for Lack of Personal Jurisdiction ("ELE Mem.") at 1-4, 9, 16, 19. ELE's counsel never advised the Court that these statements were incorrect, even after counsel clearly had such knowledge. Cf. Jones v. Derwinski, 1 Vet. App. 596, 606 (Vet. App. 1991)("[T]here is an inherent professional obligation imposed upon attorneys to correct misstatements."); Hale v. Sklodowski, No. 87 C 8817, 1988 WL 61184, at *3 (N.D. Ill. June 2, 1988)("The obligation to disclose contrary authority also imposes an obligation on attorneys to correct an inaccurate statement when they learn of it."). Their failure to do so is disturbing.

In response to an interrogatory, ELE identified twelve manufacturers who it had reason to believe purchased LCDIs for air conditioners which would ultimately be offered for sale in the United States. See Xie Decl., Exhibit ("Ex.") M (Defendant Shanghai ELE Manufacturing Corporation's Second Supplemental Response to Plaintiff Tower's First Set of Interrogatories Relating to Jurisdictional Issues) at 2-4. Records obtained by Tower indicate that between January 2005 and June 2007 ELE sold at least [REDACTED] LCDIs to these manufacturers and that it received at least [REDACTED] from these sales. See Plaintiff Tower's Memorandum in Support of Objection to Defendant's Motion to Dismiss for Lack of Personal Jurisdiction ("Tower Mem.") at 8-9 (citing Xie Decl. Exs.). Almost all of the sales occurred after December 1, 2005. See Xie Decl., Exs. N-EE.

Eight of the manufacturers are located in China. See Xie Decl., Ex. M at 2-4. They include: Haier (Dalian) Electrical Appliance Co., Ltd. ("Haier"); Daewoo Air Conditioner (Tianjin) Co., Ltd. ("Daewoo"); Fedders (Shanghai) Co., Ltd. ("Fedders Shanghai"); Fedders Xinle Co., Ltd. ("Fedders Xinle"); Guangdong Midea Refrigerate Equipment Co., Ltd. ("Midea"); and LG Electronics Tianjin Appliances Co., Ltd. ("LG"). See Xie Decl. ¶¶ 20-29, 32-33. The sales of LCDIs to these manufacturers occurred in China. See Zhang Decl. ¶ 15.

Three of the manufacturers are located in the United States: Friedrich Air Conditioning Co. ("Friedrich") of San Antonio, Texas; CareCo Fedders Effingham ("CareCo Fedders") of Effingham, Illinois; and Fedders Islandaire, Inc. ("Fedders Islandaire"), of East Setauket, New York.[4] See Xie Decl. ¶¶ 16-19. ELE sold LCDIs directly to these three U.S. manufacturers. See Xie Decl., Exs. N-Q. The number of LCDIs sold to these U.S. manufacturers

---

[4] A twelfth manufacturer is located in Apa, Samoa. See Xie Decl., Ex. M at 4.

is [REDACTED], and the total amount ELE realized from these sales is [REDACTED]. See Xie Decl. ¶¶ 16-19 (citing id., Exs. N-Q). Breaking these figures down by company, between July 24, 2006, and March 19, 2007, ELE sold [REDACTED] LCDIs to Friedrich at a total price of [REDACTED]. See Xie Decl. ¶ 17. These sales are reflected in sixteen invoices which ELE sent to Friedrich during this eight month period. See Xie Decl., Ex. N. ELE's sales to CareCo Fedders and Fedders Islandaire are much smaller. On June 9, 2006, ELE sold [REDACTED] "Line Cord LCDI[s]" to Fedders Islandaire for [REDACTED], see id., Ex. Q (Purchase Order Acknowledgement), and on January 30, 2007, it sold [REDACTED] LCDI power cords to CareCo Fedders for [REDACTED], see id., Ex. P (Invoice).

Among the retailers in the United States selling air conditioners containing LCDIs manufactured by ELE: are Wal-Mart Stores, Inc. ("Wal-Mart"); Home Depot U.S.A. ("Home Depot"); Lowe's Home Centers, Inc. ("Lowe's"); and Benny's Inc. ("Benny's").[5] See Xie Decl. ¶¶ 13-14; id., Ex. K at 1 (List of Benny's stores); id., Ex. L (Documents produced by Wal-Mart Stores, Inc.); Declaration of James E. Fajkowski ("Fajkowski Decl.") ¶¶ 3-4; Declaration of Kenneth L. Laliberte ("Laliberte Decl.") ¶¶ 2-8. In 2006, Wal-Mart sold [REDACTED] Haier Model No. HWF05XC6 air conditioners in the United States which were likely equipped with LCDIs manufactured by ELE. See Xie Decl., Ex. L.[6] Of these [REDACTED] air conditioners, [REDACTED] were

---

[5] Benny's is a Rhode Island company that operates a chain of hardware stores in Rhode Island, Massachusetts, and Connecticut. See Declaration of Kenneth X. Xie ("Xie Decl."), Ex. K at 1 (List of Benny's stores).

[6] See n.8.

sold in Wal-Mart stores in Rhode Island.[7] See Letter from Cotter to Martin, M.J., of 11/29/07, Ex. L at 1. In 2006, Benny's stores in Rhode Island sold [REDACTED] air conditioners which were likely made by Haier and equipped with ELE LCDIs.[8] See id.,

---

[7] The Court bases this finding on the following facts. The [REDACTED] Haier air conditioners sold by Wal-Mart stores in Rhode Island during 2006 have the same capacity (5,200 BTU), same model number (HFW05XC6), and same Universal Price Code (UPC 68805734442) as the Haier air conditioners with ELE LCDIs that Tower's owner, Louis J. Shatkin, purchased on August 28, 2006, at the Benny's store in East Greenwich, Rhode Island, and that James E. Fajkowski, an attorney in the law firm representing Tower, inspected on January 24, 2007, at the Benny's store in Greenville, Rhode Island. See Letter from Cotter to Martin, M.J., of 11/29/07; id., Ex. L; Declaration of Louis J. Shatkin ("Shatkin Decl.") ¶¶ 2-4; id., Ex. 2 (photograph of air conditioner box); Declaration of James E. Fajkowski ("Fajkowski Decl.") ¶¶ 6, 10-12; id., Ex. 4 (photograph of air conditioner and box).

[8] ELE questions whether the evidence which Tower has submitted supports this conclusion. See Letter from Polk to Martin, M.J., of 12/3/07 at 1. It is true the records provided by Benny's only identify the air conditioners sold by BTU capacity and not by brand name and model number. See Xie Decl., Ex. K. However, Tower's counsel indicated that the records were produced in response to a subpoena requesting information about Haier air conditioners which Tower had reason to believe were equipped with ELE LCDIs. See Tape of 11/21/07 Hearing. Presumably, the basis for Tower's subpoena was the purchase or examination of these Haier air conditioners at Benny's stores by Mr. Shatkin and Mr. Fajkowski. See Shatkin Decl. ¶¶ 2-4; Fajkowski Decl. ¶¶ 6-11. In a post hearing submission, Tower further supported its position by submitting invoices showing that on March 2, 2006, Benny's Inc., of Esmond, Rhode Island, purchased [REDACTED] Model HWF05XC6 5,200 BTU air conditioners from Haier America Trading, L.L.C., and that on March 3, 2006, it purchased [REDACTED] Model HWR08XC5 8,000 BTU air conditioners from the same entity. See Letter from Cotter to Martin, M.J., of 11/29/07, Ex. K at 4-5. The latter model had also been determined by Tower likely to be equipped with an LCDI made by ELE. See Fajkowksi Decl. ¶¶ 7-8.

Although ELE has been on notice since October 26, 2007, of Tower's claim that the Benny's stores in Rhode Island sold [REDACTED] Haier models equipped with ELE LCDIs in 2006, ELE has submitted no evidence to contradict this claim. Cf. Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995)("where the plaintiff's factual allegations 'are not directly controverted, [they] are taken as true for purposes of determining jurisdiction ...")(quoting Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1588, 1563 (Fed. Cir. 1994)(alterations in original)). It appears that it would have been a relatively simple task for ELE to contact Benny's and determine if Tower was

Ex. K at 2-3. Lowe's stores in Rhode Island sold Frigidaire air conditioners in 2006 equipped with LCDIs made by ELE.[9] See Laliberte Decl. ¶¶ 2-8. Tower was also able to determine that the Home Depot store in Salem, Massachusetts, sold a 10,000 BTU Everstar air conditioner on July 3, 2006, which was equipped with an LCDI made by ELE. See Fajkowski Decl. ¶¶ 2-4.

ELE maintains a website. See Xie Decl. ¶ 8. On a web page entitled "About ELE," there are links to several air conditioner manufacturers, including Haier, Daewoo, Fedders Corporation, Midea, Trane, Samsung, and General Electric. Id., Ex. F. There is also a link to "The Home Depot." Id. The names and logos of these air conditioner manufacturers and Home Depot are prominently displayed on the page. See id.

On a web page entitled "Mission," ELE states that it has a "customer support center in America, providing global service," Xie Decl., Ex. II at 1. Notwithstanding this statement, ELE denies that it has a customer support center in the United States.[10] See Xie Decl., Ex. G (Defendant Shanghai ELE

---

misinterpreting the records which Benny's had provided. Hence, I find that ELE has acquiesced in the trustworthiness of the evidence produced by Benny's. See Beverly Hills Fan, 21 F.3d at 1562 (noting that "[d]efendants have not shown why they could not have independently surveyed the number of accused fans for sale at these outlets" and finding that defendants "acquiesced in the trustworthiness of the evidence").

[9] On July 19, 2006, a Tower employee purchased a 25,000 BTU Frigidaire air conditioner from the Lowe's store in Cranston, Rhode Island, and on December 15, 2006, he purchased an 8,000 BTU Frigidaire air conditioner from the Lowe's store in Warwick, Rhode Island. See Declaration of Kenneth L. Laliberte ("Laliberte Decl.") ¶¶ 2, 6. Both were equipped with ELE LCDIs. See id. ¶¶ 4, 8.

[10] When asked to explain the meaning of the statement on its website "customer support center in America," Xie Decl., Ex. II at 1, ELE's Vice President of Sales, Barkley Bao, stated:

> I do not have a recollection as to how that phrase was written or why those particular words were used. However, in general

Manufacturing Corporation's Answers and Objections to Plaintiff Tower Manufacturing Corporation's Written Deposition Questions) at 11 (Answer to Question No. 57). ELE's vice-president of sales, Barkley Bao, responded to an interrogatory inquiring about what customer support ELE has provided to United States customers by stating that ELE "does not have a formal customer support department. Shanghai ELE's sales department will handle post-sales issues if a customer calls, including issues with shipment or payment. Technical questions are sometimes forwarded to engineers." Id. at 5 (Answer to Question No. 19). Bao was repeatedly asked if ELE has provided customer support to United States customers, and he repeatedly responded that he was not aware of ELE providing customer support regarding "LCDIs to any United States customers."[11] Id. at 5-6.

There are references on the "Mission" web page to ELE "relying on UL standard of America," id., Ex. II at 1, to ELE's products "all under UL label," id., at 2, and to ELE's "100% test in UL standard," id. In addition, the following statements appear on the same web page (and are reproduced without correction):

We broke through the technical blockade of America and

---

> that phrase refers to a Shanghai telephone number that is provided to GFCI customers. Any calls to that number are received at Shanghai ELE in China. Shanghai ELE does not have any physical presence in the U.S.

Xie Decl., Ex. G (Defendant Shanghai ELE Manufacturing Corporation's Answers and Objections to Plaintiff Tower Manufacturing Corporation's Written Deposition Questions) at 11 (Answer to Question No. 57). Mr. Bao also stated that "[i]n general, a reference to supporting American customers was included because of possible questions arising from GFCI sales in the United States." Id. at 12 (Answer to Question No. 70).

[11] The Court infers from Bao's qualified responses to these questions that ELE has provided customer support to customers in the U.S. regarding its GFCI product.

> developed GFCI in 2003.
>
> In 2004, we successfully developed Linkage Circuit Detect Interrupter (LCDI), the series become one of the first company coming into the market.
>
> In 2006, we broke through the technical blockade of America again and developed GFCI of 2006 version.
>
> Acquired many invention patent of America.

Xie Decl., Ex. II at 2.

ELE uses customer feedback forms to obtain information from its customers regarding the quality of its products. Bao stated that "[a]fter a duly diligent review of our customer support feedback files, I have not located records of any instances in which such support was provided to any LCDI customer." Xie Decl., Ex. G at 7 (Answer to Question No. 30). However, the record includes a customer feedback form from LG which LG used to report and return from the United States defective LCDIs. See Xie Decl. ¶ 39; see also id., Ex. JJ.[12]

**Law**

Federal Circuit law governs the issue of personal jurisdiction in a patent-related case. Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found., 297 F.3d 1343, 1348 (Fed. Cir. 2002); Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995)(stating that in determining whether a district court may exercise personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit applies and not that of the regional circuit in which the action arose); Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1561 n.4 (Fed. Cir. 1994)(explaining that the law of the regional circuit

---

[12] Ex. JJ is almost entirely in Chinese. Tower represents that the customer feedback form was used by LG to return defective LCDIs from the United States to ELE, see Tower Mem. at 11, and the Court has accepted this representation.

applies "to procedural matters that are not unique to patent law"); see also 3D Sys., Inc. v. Aarotech Labs., 160 F.3d 1373, 1377 (Fed. Cir. 1998)(stating that "[t]he district court erred by applying Ninth Circuit law in its federal due process analysis"). Thus, this Court applies the law of the Federal Circuit and not that of the First Circuit (except as to any procedural matters that are not unique to patent law). See Beverly Hills Fan, 21 F.3d at 1561 n.4.

"In order to establish personal jurisdiction in a patent infringement case over a non-resident defendant whose products are sold in the forum state, a plaintiff must show both that the state long arm statute applies and that the requirements of due process are satisfied." Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp., 395 F.3d 1315, 1319 (Fed. Cir. 2005); accord Beverly Hills Fan, 21 F.3d at 1560 ("The [district] court correctly realized that there were two limits to its jurisdictional reach: Virginia's long-arm statute and the Due Process Clause of the U.S. Constitution."); see also Viam Corp. v. Iowa Export-Import Trading Co., 84 F.3d 424, 427 (Fed. Cir. 1996). Where the state long-arm statute authorizes the exercise of jurisdiction to the full extent permitted by the United States Constitution, this inquiry collapses into a single question. See Deprenyl, 297 F.3d at 1350; see also Viam, 84 F.3d at 427 (explaining that because the California long arm statute extends the reach of personal jurisdiction to the full limits of the Federal Constitution, the question "is whether sufficient contacts exist between [defendant] and the State of California to satisfy the requirements of International Shoe [Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154 (1945)]"). Because the Rhode Island long arm statute authorizes assertion of personal jurisdiction to the fullest extent permitted by the United States Constitution, Women & Infants Hosp. of Rhode Island v. Cmty.

Health Network of Connecticut, Inc., 394 F.Supp.2d 488, 491 (D.R.I. 2005)(citing Donatelli v. Nat'l Hockey League, 893 F.2d 459, 461 (1st Cir. 1990)), the question here is whether asserting personal jurisdiction over ELE is consistent with the Due Process Clause, Brian Jackson & Co. v. Eximas Pharm. Corp., 248 F.Supp.2d 31, 35 (D.R.I. 2003). The ultimate inquiry turns on whether there are sufficient contacts between ELE and the State of Rhode Island. Central Tools, Inc. v. Mitutoyo Corp., 381 F.Supp.2d 71, 74 (D.R.I. 2005)(citing Viam, 84 F.3d at 427).

In International Shoe and subsequent cases, the Supreme Court established a two-pronged test for whether the exercise of jurisdiction comports with due process. Deprenyl, 297 F.3d at 1350. "First, the defendant must have 'minimum contacts' with the forum. Where a defendant's contacts are continuous and systematic, due process permits the exercise of general jurisdiction." Id. (quoting International Shoe, 326 U.S. at 316, 66 S.Ct. at 158 and citing LSI Indus., Inc. v. Hubbell Lighting, Inc., 232 F.3d 1369, 1375 (Fed. Cir. 2000)). At the hearing, Tower's counsel stated that it was not necessary for the Court to address the issue of general jurisdiction. See Tape of 11/21/07 Hearing. Thus, in this case the issue is whether ELE's contacts authorize the exercise of specific jurisdiction.

For specific jurisdiction, the "minimum contacts" prong requires the plaintiff to show that the defendant "has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." Deprenyl, 297 F.3d at 1350 (quoting Inamed Corp. v. Kuzmak, 249 F.3d 1356, 1360 (Fed. Cir. 2001)(quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-76, 105 S.Ct. 2174, 2181-84 (1985))). Thus, for this prong the burden of proof is on the Plaintiff to "establish minimum contacts." Inamed, 249 F.3d at 1360 (internal quotation marks

omitted). "Specific jurisdiction 'arises out of' or 'relates to' the cause of action even if those contacts are 'isolated and sporadic.'" LSI Indus., 232 F.3d at 1375 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73, 105 S.Ct. 2174, 2182 (1985)); see also Trintec Indus. v. Pedre Promotional Prods., Inc., 395 F.3d 1275, 1279 (Fed. Cir. 2005).

The second prong of the due process test provides the defendant an opportunity to defeat jurisdiction by presenting a compelling case that other considerations render the exercise of jurisdiction so unreasonable as to violate "fair play and substantial justice." Deprenyl, 297 F.3d at 1351 (citing Inamed, 249 F.3d at 1360 (quoting Burger King, 471 U.S. at 476-77, 105 S.Ct. at 2184-85)). In the second prong, the burden of proof is on the defendant to demonstrate the presence of other considerations that render the exercise of jurisdiction unreasonable. Inamed, 249 F.3d at 1360.

The Federal Circuit has summarized the pertinent Supreme Court jurisprudence by articulating a three-factor test. Deprenyl, 297 F.3d at 1351 (citing Akro, 45 F.3d at 1545). The three factors for determining whether the exercise of personal jurisdiction over an out-of-state defendant comports with due process are: 1) whether the defendant "purposefully directed" its activities at residents of the forum; 2) whether the claim "arises out of or relates to" the defendant's activities in the forum; and 3) whether the exercise of jurisdiction is "reasonable and fair." Id. (citing Inamed, 249 F.3d at 1360 (quoting Akro, 45 F.3d at 1545)). The first two factors correspond with the "minimum contacts" prong of the International Shoe analysis, and the third factor corresponds with the "fair play and substantial justice prong of the analysis." Id.

**Discussion**

***I. Purposeful Direction***

The first question which must be considered is whether ELE "purposefully directed" its activities at residents of the forum. See Deprenyl, 297 F.3d at 1351. In answering this question, the Court finds the analysis of Asahi Metal Industries Co. v. Superior Court of California, 480 U.S. 102, 107 S.Ct. 1026 (1987), which appears in Beverly Hills Fan, 21 F.3d 1558 (Fed. Cir. 1994), and Commissariat, 395 F.3d 1315 (Fed. Cir. 2005), instructive. Asahi presented the Supreme Court with the following question:

> [W]hether the mere awareness on the part of a foreign defendant that the components it manufactured, sold, and delivered outside the United States would reach the forum State in the stream of commerce constitutes "minimum contacts" between the defendant and the forum State such that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'"

Asahi, 480 U.S. at 105, 107 S.Ct. at 1028 (quoting International Shoe, 326 U.S. at 316, 66 S.Ct. at 158 (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 342 (1940))). Although all of the Justices agreed in Asahi that on the facts of the case jurisdiction did not lie in California, the Beverly Hills Fan court noted that:

> [A]pparently all of the Justices agreed that the stream of commerce theory provides a valid basis for finding requisite minimum contacts. The split was over the exact requirements for an application of the theory.
>
> Four Justices were of the view that an exercise of personal jurisdiction requires more than the mere act of placing a product in the stream of commerce. As Justice O'Connor expressed it, there must be in addition "*an action of the defendant purposefully directed toward the forum State*." Asahi, 480 U.S. at 112, 107 S.Ct. at 1032. (Emphasis in original) But four of the Justices

considered the showing of 'additional conduct' unneeded:

> "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale .... A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity."

Beverly Hills Fan, 21 F.3d at 1566 (quoting Asahi, 480 U.S. at 117, 107 S.Ct. at 1034-35 (Brennan, White, Marshall & Blackmun, JJ., concurring in part and concurring in the judgment)); see also Commissariat, 395 F.3d at 1320 (explaining the different positions taken by Justices O'Connor and Brennan regarding question of "minimum contacts"). The view expressed by Justice O'Connor came to be known as "stream of commerce plus." Fortis Corporate Ins. v. Viken Ship Mgmt., 450 F.3d 214, 218 (6th Cir. 2006); Clune v. Alimak AB, 233 F.3d 538, 542 (8th Cir. 2000); Pennzoil Prods. Co. v. Colelli & Assocs., 149 F.3d 197, 205 n.8 (3rd Cir. 1998)(noting standard); Homedics, Inc. v. Yejen Indus., Ltd., No. 05-CV-70102-DT, 2006 WL 2594918, at *4 (E.D. Mich. Sept. 8, 2006); Jacobs Chuck Mfg. Co. v. Shandong Weida Mach. Co., No. Civ. A. 2:05-CV-185, 2005 WL 3299718, at *3 (E.D. Tex. Dec. 5, 2005).

The Beverly Hills Fan court concluded that it was unnecessary to resolve which of the two views of the stream of commerce theory was correct because under either version the plaintiff had made the required jurisdictional showing. See Beverly Hills Fan, 21 F.3d at 1566. The court found that the "defendants, acting in consort, placed the accused fan in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state

were such that they should reasonably have anticipated being brought into court there." Id.

This Court finds that the circumstances of the instant case are similar to those in Beverly Hills Fan and that the facts are sufficient to meet even the "stream of commerce plus" test. ELE has done far more than simply release its product into the stream of commerce.

First, it can reasonably be inferred that ELE designed its LCDI and GFCI products for the U.S. market (including Rhode Island). These design efforts demonstrate an intent and purpose to serve the residents of this forum. See Commissariat, 395 F.3d at 1323 (stating that a defendant's design efforts directed to the U.S. market (including Delaware) is pertinent evidence of an intent and purpose to serve the Delaware market); cf. Asahi, 480 U.S. at 113, 107 S.Ct. at 1032 (finding defendant had not purposefully availed itself of the California market where there was "no evidence that [defendant] designed its product in anticipation of sales in California"). ELE obtained UL certification for both it LCDIs and GFCIs. See Xie Decl. ¶¶ 4-5; id. Exs. B-C. The electrical connectors (i.e., the prongs on the plug for the LCDIs) conform to the standards of the National Electrical Manufacturer's Association ("NEMA"), an American standard setting organization that publishes electrical standards for North America. See Xie Decl. ¶ 6. This plug prong configuration is not used in Europe, Africa, or most of Asia. See Defendant Shanghai ELE Manufacturing Corporation's Reply Brief in Support of Its Motion to Dismiss for Lack of Personal Jurisdiction ("ELE Reply Mem."), Ex. A (Worldwide Plug Type Selector). Indeed, the largest single market for this plug

configuration appears to be the United States.[13] The warnings on the LCDIs are imprinted in English, and ELE is identified in a statement printed in English on the LCDI housing. See Xie Decl., Ex. A.

Second, ELE has marketed its products to and for the United States. See Commissariat, 395 F.3d at 1323 (stating that an intent and purpose to serve the market in a particular state, such as Delaware, may be evidenced by "design and marketing efforts directed to the U.S. market (including Delaware)"). Here ELE has marketed LCDIs directly to companies located in the United States as evidenced by the sales to Friedrich, CareCo Fedders, and Fedders Islandaire. This direct marketing is also reflected in Bao's August 21, 2006, email to Friedrich in which he refers to "our U.S. cusotmers [sic]," Xie Decl., Ex. I at 1, and explains how "they can wire the money to our account ...," id. The direct sales to Friedrich were not isolated occurrences, but occurred on a regular basis and produced significant revenue. During the eight months from July 2006 to March 2007, ELE issued

---

[13] ELE argues that other countries in addition to the United States use this plug configuration. See Defendant Shanghai ELE Manufacturing Corporation's Reply Brief in Support of Its Motion to Dismiss for Lack of Personal Jurisdiction ("ELE Reply Mem.") at 8-9. However, the question is not whether the United States is the exclusive market for ELE's product, but whether ELE designed its product for or directed it to the forum state. See Homedics, Inc. v. Yejen Indus., Ltd., No. 05-CV-70102-DT, 2006 WL 2594918, at *5 n.2 (E.D. Mich. Sept. 8, 2006)(describing this as the "crucial question") (quoting Fortis Corporate Ins. v. Viken Ship Mgmt., 450 F.3d 214, 222 (6th Cir. 2006)). Although ELE identifies in its reply memorandum more than thirty-five countries using this plug configuration, it is clear that the United States market is by far the largest, dwarfing almost all other markets for this product. See ELE Reply Mem. at 8-9 (identifying "American S[a]moa, Antigua and Barbuda, Bahamas, Barbados, Belize, Bermuda, Brazil, British Virgin Islands, Canada, Cayman Islands, Columbia, Cuba, Ecuador, El Salvador, Guam, Guatemala, Guyana, Haiti, Honduras, Jamaica, Mariana Islands, Marshall Islands, Mexico, Micronesia, Midway Islands, Nicaragua, Palau, Panama, Puerto Rico, Samoa, Taiwan, Trinidad and Tobago, Turks and Caicos Islands, United States, Venezuela, Virgin Islands, and Wake Island").

sixteen separate invoices to Friedrich and billed the company [REDACTED] for [REDACTED] LCDIs. See Xie Decl., Ex. O. It can be inferred from the direct sales to all three U.S. manufacturers that ELE knew that the LCDIs would be incorporated into air conditioners or other products which would be sold in the United States (including Rhode Island).

ELE has sold millions of LCDIs to other well known air conditioner manufacturers, including Haier, Daewoo, and Midea, which incorporate the LCDIs into air conditioners destined to be sold in large quantities in the U.S. ELE touts its relationships with these companies on its English website. See id., Ex. F. It also touts its relationship with a U.S. retailer, Home Depot, which has stores in forty-nine of the fifty states, see Arellano v. Home Depot U.S.A., Inc., 245 F.Supp.2d 1102, 1106 (S.D. Cal. 2003), including six stores in Rhode Island. This ongoing relationship with Home Depot is evidence of ELE's intent and purpose to serve the Rhode Island market.[14] See Commissariat, 395 F.3d at 1323 (stating that "ongoing relationships with retailers in Delaware" is evidence of a "defendant's intent and purpose to serve the Delaware market").

ELE's website contains a purchase order form for placing orders via the Internet. See Xie Decl., Ex. H. ELE also proclaims on its website that it has a "customer support center in America ..." Xie Decl., Ex. II. While ELE has denied that it

[14] Although Tower has apparently not been able to locate any evidence that a Rhode Island Home Depot store sold air conditioners equipped with LCDIs made by ELE, the fact that such an air conditioner was sold at a Home Depot store in nearby Massachusetts, see Fajkowski Decl. ¶¶ 3-4, suggests that this circumstance may be due more to happenstance than to a complete absence of such sales. There would appear to be no reason why an air conditioner with the accused infringing product would be offered for sale at a Home Depot store in Massachusetts but not at the Home Depot stores in neighboring Rhode Island. The two markets would not seem to be appreciably different.

has any physical presence in the U.S., the obvious purpose of this statement is to attract U.S. customers. ELE has suggested that this customer support reference only pertains to its GFCI products, see Xie Decl., Ex. G at 12 (Answer to Question No. 70), but the website gives no indication of this limitation, see id., Ex. II, and the Court finds the suggestion implausible.

Other statements on the website indicate that ELE has targeted its products to the U.S. market. In addition to the repeated references to "UL," ELE boasts that it has "broke[n] through the technical blockade of America ...," Xie Decl., Ex. II, and that it has acquired many American patents, see id. Among those patents is U.S. Patent No. 7,009,473 relating to GFCIs. See Tower Mem. at 5 n.2. ELE has also published a U.S. Patent Publication No. 20060061924. See id.

Third, ELE knew or had reason to believe that its LCDIs would eventually be sold in the United States and in Rhode Island. As already noted, ELE designed and marketed the LCDIs for the U.S. market, including Rhode Island. ELE produces millions of LCDIs and sells them in large quantities to several air conditioner manufacturers in China and the United States. These manufacturers in turn sell air conditioners containing the LCDIs to retailers in the United States, including national retailers such as Wal-Mart, Home Depot, and Lowe's and smaller, regional retailers such as Benny's. Given the established relationship between ELE and the manufacturers (a relationship which it advertises on its website) and the large volume of sales involved (both from ELE to the manufacturers and from the manufacturers to the retailers), it strains credulity to suggest that ELE would be unaware of the identity of the manufacturers' major customers and that air conditioners containing LCDIs made by ELE would likely be sold in states where such customers

(retailers) have stores, including Rhode Island.

The following example illustrates this point. Between October 2006 and June 2007, Haier purchased [REDACTED] LCDIs from ELE at a total cost of [REDACTED]. See Xie Decl. ¶ 23. Between May and December 2006, Wal-Mart sold [REDACTED] Haier air conditioners (Model No. HWFO5XC6) equipped with ELE LCDIs in the United States, including [REDACTED] in Rhode Island. Letter from Cotter to Martin, M.J., of 11/29/07 at 1; see also id., Ex. L. While the two periods do not correspond exactly, the numbers nevertheless make clear that Wal-Mart is a major purchaser of Haier air conditioners equipped with LCDIs made by ELE. Given the relationship which ELE has with Haier, it can be reasonably inferred that ELE was aware that Haier was selling these air conditioners to Wal-Mart and that they would likely be offered for sale in Wal-Mart stores in the United States, including Rhode Island. See Homedics, 2006 WL 2594918, at *1, *4 (finding that defendant purposefully availed itself of the United States market where, *inter alia*, defendant knew "that the massagers it sold to [an intermediary] were intended for Wal-Mart, one of the largest retailers in the United States"); see also Wal-Mart Stores, Inc. v. Gulf Ins. Co., No. Civ. 04-160-AS, 2005 WL 1231076, at *2 (D. Or. May 23, 2005)("Wal-Mart has stores in all fifty states."). Large quantities of Haier air conditioners with LCDIs made by ELE have been sold in Rhode Island by Wal-Mart and by Benny's. Similarly, Lowe's has stores in all fifty states, including Rhode Island, see www.lowes.com, and Frigidaire air conditioners containing the accused LCDIs have been sold in at least two Lowe's stores in Rhode Island,[15] see Laliberte Decl. ¶¶ 2, 6.

[15] ELE contends that "Tower at most has made out a case that ELE has sufficient minimum contacts with the United States as a whole to possibly satisfy a *nationwide* contacts test and that jurisdiction may

In sum, I find that ELE purposefully directed its activities at the United States and the residents of Rhode Island by: 1) designing its LCDIs and GFCI products for the U.S. market; 2) targeting the U.S. market through statements and logos placed on its English language website; 3) marketing LCDIs directly to manufacturers located in the U.S., who it could reasonably anticipate would distribute products incorporating the LCDIs throughout the country, including Rhode Island; 4) establishing and maintaining a relationship with a U.S. retailer (Home Depot) that has six stores in Rhode Island and touting that relationship on its website; 5) establishing commercial relationships with the manufacturers of U.S.-bound air conditioners and touting those relationships on it website; and 6) utilizing established distribution channels which result in large numbers of air conditioners equipped with its LCDIs being sold in the U.S., including Rhode Island. It can be presumed from these ongoing

---

lie in New York, Illinois, or Texas." ELE Reply Mem. at 5. It contends that "Tower fails to explain how ELE had reason to believe that its LCDIs would be sold in Rhode Island, as opposed to mere awareness that its LCDIs may be sold in the United States generally." Id. However, as set forth above, it can reasonably be inferred that ELE knew that the air conditioner manufacturers who purchased the LCDIs were selling the air conditioners to major U.S. retailers, such as Wal-Mart, Home Depot, and Lowe's, and that those air conditioners would be sold in states where these retailers have stores, including Rhode Island. ELE claims a relationship with Home Depot, and it should not be heard to complain when it is required to appear in a district where Home Depot has stores and where Wal-Mart, Lowe's, and Benny's stores have together sold a large number of air conditioners containing the accused LCDIs (even if no sales of an offending air conditioner can be documented at a Home Depot store in Rhode Island).

Moreover, it is important to remember that Tower is not precluded from bringing suit in Rhode Island just because a greater number of infringing LCDIs were sold directly to Friedrich in Texas [REDACTED] or to Fedders Islandaire in New York [REDACTED]. See Beverly Hills Fan, 21 F.3d at 1568 n.21 (noting that plaintiff is not precluded from bringing suit in Virginia just because the bulk of the harm inflicted on it may occur through sales in other states); see also Xie Decl., Ex. O, Ex. Q.

relationships that the distribution channels which ELE formed with these U.S. and foreign companies were intentionally established and that ELE knew or reasonably could have foreseen that a termination point of those channels was Rhode Island. See Beverly Hills Fan, 21 F.3d at 1564 (presuming, based on ongoing relationships, that distribution channel formed between defendants and retailer was intentionally established and that defendants knew or reasonably could have foreseen that a termination point of the channel was Virginia);[16] cf. Honeywell, Inc. v. Metz Apparatewerke, 509 F.2d 1137, 1144 (7th Cir. 1975) ("We look to the economic and commercial realities of this case ... it is not within the contemplation of the concepts of fairness and due process to allow a wrongdoing manufacturer to insulate himself from the long arm of the courts by using an intermediary or by professing ignorance of the ultimate destination of his products.").

***II. Relatedness***

The Court now turns to the second factor, i.e. whether Tower's claim "arises out of or relates to" ELE's activities in the forum. Deprenyl, 297 F.3d at 1351. This is a patent infringement case, and the situs of the injury is the location,

---

[16] ELE argued at the hearing that Beverly Hills Fan is distinguishable from the instant case because the Chinese manufacturer had a relationship with a distributor in the United States and the distributor provided a warranty for the product. See id. at 1560. To the extent that ELE contends that it cannot be found to have utilized established distribution channels to send LCDIs into Rhode Island in the absence of evidence that ELE directly controlled those channels or had a relationship with a U.S. distributor, such argument is unpersuasive. See Motorola, Inc. v. PC-Tel, Inc., 58 F.Supp.2d 349, 355 (D. Del. 1999)(discussing Beverly Hills Fan and rejecting argument that "the manufacturer's *control* over the chain of distribution" was essential to the court's finding that the manufacturer (Ultec) was subject to personal jurisdiction in Virginia because of the activities of its distributor (Royal)).

or locations, at which the infringing activity directly impacts on the interests of the patentee. Beverly Hills Fan, 21 F.3d at 1571; see also Zoltek Corp. v. United States, 442 F.3d 1345, 1363 n.8 (Fed. Cir. 2006)(noting that in cases addressing personal jurisdiction in patent cases the Federal Circuit has looked to "the location ... at which the infringing activity directly impacts on the interests of the patentee")(quoting Beverly Hills Fan, 21 F.3d at 1571)(alteration in original). Here Tower has presented evidence of the sale in Rhode Island of a significant number of air conditioners containing the infringing LCDIs. Such sales obviously impact upon Tower, especially given the fact that Tower is located in Rhode Island.

ELE argues that because patent infringement "occurs when a party 'without authority makes, uses, offers to sell or sells any patented invention,'" ELE Mem. at 18 (quoting 35 U.S.C. § 271(a)), Tower must show that ELE did one of these activities in Rhode Island, id. at 18-19. ELE further argues that infringement cannot be based solely on acts done in a foreign county. See id. at 1, 6 (citing Rotec Indus., Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1251 (Fed. Cir. 2000)). However, ELE focuses only on Tower's claims of direct infringement under § 271(a) and overlooks Tower's claim that ELE is "actively inducing infringement of, and/or contributorily infringing the '241 patent ...," Complaint ¶ 11, under 35 U.S.C. §§ 271(b) and 271©), see id.; cf. Honeywell, 509 F.2d at 1141 ("Section 271(b), Title 35 U.S.C. ... may be broadly described as an aiding and abetting statute ...."); id. (explaining that "'active inducement' may be found in events outside the United States if they result in a direct infringement here"). Thus, because Tower has alleged not only direct infringement but also contributory and inducement of infringement for acts that have resulted in direct infringement

in Rhode Island, the cause of action for this suit arises in Rhode Island. Cf. Honeywell, 509 F.2d at 1142 ("An induced infringement, such as that alleged by [plaintiff] is a tortious act committed within the state of Illinois ... even though it is not asserted that [defendant] performed any specific act in that state."). Rotec Industries, cited by ELE, is distinguishable because it involved claims of direct infringement under § 271(a). See Rotec Indus., 215 F.3d at 1251. Accordingly, I find that Tower's claim arises out of or relates to ELE's activities in Rhode Island.

***III. Reasonableness***

This brings the Court to the third factor, whether the exercise of jurisdiction is "reasonable and fair." Deprenyl, 297 F.3d at 1351. Determining whether ELE has demonstrated that the exercise of jurisdiction would be so unreasonable as to violate fair play and substantial justice requires consideration of several factors. Deprenyl, 297 F.3d at 1355. These include: 1) the burden on the defendant; 2) the interests of the forum state; 3) the plaintiff's interest in obtaining relief; 4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and 5) the shared interest of the several states in furthering fundamental substantive social policies. Id.

***A. Burden on Defendant***

ELE asserts that the burden for it to defend itself in Rhode Island is substantial because it "has no presence in Rhode Island." ELE Mem. at 21. It states that all documents and materials relating to the design, invention, manufacturing, and sales of ELE's LCDI devices are located in China. See id. It further states that all of ELE's knowledgeable personnel and staff reside in China. See id. at 21-22. Finally, ELE claims

that because of travel restrictions imposed on Chinese citizens by the United States and Chinese governments, it will be very difficult for ELE's witnesses to come to Rhode Island to testify at the trial of this action. See id. at 22.

Requiring a Chinese manufacturer to appear in a United States court to defend a patent infringement action is not unprecedented. See Beverly Hills Fan, 21 F.3d at 1569 (requiring Chinese manufacturer to appear in Virginia to defend patent infringement case); id. (noting that progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome)(citing World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 294, 100 S.Ct. 559, 565 (1980)); Jacobs Chuck Mfg. Co. v. Shandong Weida Mach. Co., No. Civ.A. 2:05-CV-185, 2005 WL 3299718, at *9 (E.D. Tex. Dec. 5, 2005); see also Homedics, Inc. v. Yejen Indus., Ltd., No. 05-CV-70102-DT, 2006 WL 2594918, at *6 (E.D. Mich. Sept. 8, 2006)(requiring Chinese company to appear in Michigan court to defend against allegations of false designation of origin, false advertising, and trade dress infringement).

Furthermore, ELE filed a patent infringement action on February 16, 2007, in the Central District of California, Shanghai ELE Manufacturing Corp. v. Technology Research Corp., 07-1102 (transferred to the Middle District of Florida, (8:07-CV-1007, filed June 11, 2007)). See Tower Mem. at 25. Presumably, most, if not all, of the difficulties and obstacles which ELE cites as reasons why it should not be required to defend this action in Rhode Island also exist in its enforcement action against Technology Research Corp., and ELE has seen fit to proceed with that action notwithstanding these impediments. ELE is also a party defendant in two ongoing federal matters, Pass & Seymour, Inc. v. General Protecht Group, Inc., 5:07-cv-00833-DHN-

GJP (N.D.N.Y., filed Aug. 16, 2007), and In the Matter of Certain Ground Fault Circuit Interrupters & Products Containing the Same, Inv. No. 337-TA-615 (Inter. Trade Comm'n, filed Aug. 16, 2007). See Tower Mem. at 25. Moreover, ELE has recently availed itself of this Court's forum in a separate matter by moving to compel Tower to comply with a subpoena which ELE had issued in connection with its action against Technology Research Corp. Cf. Homedics, 2006 WL 2594918, at *6 (finding Chinese manufacturer's claim of substantial burden unpersuasive where manufacturer had already exhibited familiarity with the administrative and legal processes by registering its products with the FDA and by seeking and obtaining at least one patent in the United States). Lastly, the same technology that facilitates ELE's conducting business with customers in the United States (the Internet, email, fax machines, teleconferencing, videoconferencing, daily international commercial flights, express delivery services, etc.) equally facilitates ELE's ability to defend itself in Rhode Island. See Jacobs Chuck, 2005 WL 3299718, at *9. Given all of the foregoing circumstances, the Court finds unpersuasive ELE's claim that defending this action will place an undue burden upon ELE.

***B. Interests of the Forum State***

Rhode Island has four significant interests in this dispute. First, Tower is a Rhode Island corporation, and the state has an interest in providing a judicial forum for Rhode Island residents who claim that they have been injured. Second, because thousands of air conditioners containing the allegedly infringing LCDIs were sold in Rhode Island, Tower has suffered injury in this forum. See Commissariat, 395 F.3d at 1318 ("[T]he tortious injury caused by patent infringement occurs within the state where the allegedly infringing sales are made."). Rhode Island

has an interest in discouraging injuries that occur within the state, and that interest extends to intellectual property injuries, including patent infringement. See Beverly Hills Fan, 21 F.3d at 1568. Third, Rhode Island has an interest in discouraging alien and nonresident manufacturers from using this state as a conduit for distributing infringing products. Fourth, Rhode Island has a substantial interest in cooperating with other states to provide a forum for litigating federal claims. See id.

***C. Plaintiff's Interest***

As already noted, Tower is a Rhode Island corporation, and it alleges that it is being injured in this jurisdiction by sales of products containing the allegedly infringing LCDIs. Tower has selected this forum, and it has a strong interest in having this matter adjudicated here.

***D. Judicial System's Interest***

The judicial system has an interest in obtaining the most efficient resolution of this controversy. Although jurisdiction may also exist in other districts, it appears to the Court that Rhode Island has the strongest connection to the controversy by virtue of the fact that Tower is a Rhode Island corporation and substantial sales of products containing the allegedly infringing LCDIs have occurred in this state.

***E. States' Common Interest***

Rhode Island has a substantial interest in cooperating with other states to provide a forum for efficiently litigating Tower's cause of action. See Beverly Hills Fan, 21 F.3d at 1568. Tower will be able to seek redress in Rhode Island for the harm it has allegedly suffered due to ELE's alleged infringement of Tower's patent. As a result, the other states will be spared the burden of providing a forum for Tower to seek redress for the injuries it claims. See id.

***F. Conclusion Re Reasonableness***

After considering the foregoing factors, the Court concludes that ELE has not demonstrated that this is "one of those 'rare cases[,]'" Deprenyl, 297 F.3d at 1356 (quoting Beverly Hills Fan, 21 F.3d at 1568), where, despite ELE's minimum contacts with Rhode Island, it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances presented, see Beverly Hills Fan, 21 F.3d at 1568. It is certainly not "the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." Id.

**Summary**

In summary, I find that ELE has purposely directed its activities at the United States and the District of Rhode Island. I further find that Tower's claim arises out of or relates to ELE's activities in this District and that the exercise of jurisdiction is reasonable and fair. Accordingly, specific jurisdiction over ELE exists, and the Motion to Dismiss should, therefore, be denied. I so recommend.

Having determined that specific jurisdiction exists, the Court finds that it is unnecessary to consider Tower's alternative argument that the exercise of jurisdiction over ELE comports with Due Process using "a 4(k)(2) National Contacts Approach." Tower Mem. at 28.

**Conclusion**

For the reasons stated above, I find that the Motion to Dismiss should be denied, and I so recommend. Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific

objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
January 15, 2008