UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| TOWER MANUFACTURING CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>SHANGHAI ELE MANUFACTURING CORPORATION,<br><br>Defendant. | CIVIL ACTION<br>NO. 06-00170-S-DLM |

**MEMORANDUM OF LAW IN RESPONSE**
**TO TOWER'S MOTION FOR SANCTIONS**


OF COUNSEL

Tony D. Chen (*Pro Hac Vice*)
Email: tony.chen@bingham.com
Bingham McCutchen LLP
1620 26th Street, Suite 4000N
Santa Monica, CA 90404-4060
Phone: 310-225-9025
Fax: 310-907-2025

Joshua M. Dalton (*Pro Hac Vice*)
Email: josh.dalton@bingham.com
Lawrence T. Stanley, Jr. (*Pro Hac Vice*)
Email: lawrence.stanley@bingham.com
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
Phone: 617-951-8721
Fax: 617-951-8736

Jeffrey S. Brenner (#4369)
Email: jbrenner@nixonpeabody.com
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
Phone: 401-454-1042
Fax: 401-454-1030

*Attorneys for Shanghai ELE Manufacturing Corporation*

To put it mildly, this is not the first time Tower has mentioned sanctions in this matter. To date, Tower has already filed a motion seeking sanctions on at least eight different grounds, threatened two additional sanctions motions, including for what it thought were insufficiently detailed affirmative defenses,[1] and now has filed this motion, once again asking this Court to severely punish ELE and its attorneys. Fully consistent with Tower's past practice, it files this motion on a hodge-podge of sometimes minor grounds, the vast majority of which this Court has already addressed in a prior sanctions motion, and ***all*** of which have already been raised by Tower in previous filings. Worst still, the very motion in which Tower asks this Court to exercise its inherent power to level a (possibly record-setting) sanction for *hundreds of thousands of dollars* against ELE for alleged inaccuracies and overstatements contains numerous inaccuracies and overstatements of its own. For example:

**Claim:** "… as CEO it is hard to believe that [Long Zhang] did not know that Shanghai ELE had sold ***vast quantities*** of LCDIs to U.S. customers (74,247 units for $391,565) that Tower later uncovered." Tower Br. at 7 (emphasis added).

---

[1] Tower's first threatened motion for sanctions came on May 25, 2007, when despite knowing that ELE's counsel was in Hong Kong at the time and despite ELE's good faith efforts to address any and all of Tower's concerns with ELE's discovery responses, Tower's counsel sent an email at 10:53 AM EST (10:53 PM local time in Hong Kong) to ELE's counsel informing ELE that Tower intended to file a motion for sanctions against ELE at 1:30 PM EST that same day (1:30 AM local time in Hong Kong). ELE's local counsel promptly responded to Tower's counsel's email and expressed his concerns as to why Tower insisted that its motion for sanctions must be filed by 1:30 PM EST. Tower subsequently agreed to delay filing its motion until Tuesday, May 29, 2007. On Tuesday, May 29, 2007 at approximately 3:33 AM local time in Hong Kong (3:23 PM EST), ELE's counsel responded by email to Tower's draft motion for sanctions and explained in detail why Tower's motion was without merit. Tower did not file its motion for sanctions on May 29, 2007. Second, after ELE filed its Answer and Counterclaim to Tower's Complaint, Tower sent a letter and served a motion for sanctions under Rule 11 on the grounds that ELE did not sufficiently plead the standard patent litigation defenses of inequitable conduct, unclean hands, and patent misuse. Notably, in a prior litigation between Tower and Technology Research Corporation ("TRC") before this very Court (*Tower Manufacturing Corporation v. Technology Research Corporation*, C.A. No. 06-212-T-DLM (D.R.I.) (the "Tower-TRC Litigation")), Tower filed a Motion for More Definite Statement with respect to TRC's inequitable conduct, unclean hands, and patent misuse affirmative defenses and counterclaims, and the Court denied that motion. Although ELE's Answer and Counterclaim had the same level of detail that this Court found appropriate in the Tower-TRC Litigation, and ELE therefore was well aware that Tower's draft motion for sanctions was meritless, ELE compromised and withdrew those affirmative defenses in order to avoid the time and expense of opposing that motion and wasting further court resources on such an unnecessary motion.

**THE TRUTH:** ELE's sales of LCDIs directly into the United States (*i.e.*, less than 75,000 at the time Mr. Zhang signed the declaration) do not represent "vast quantities" relative to ELE's world-wide sales, for which ELE has sold several million LCDI devices, the vast majority of which were, and are, to Far East manufacturers.

**Claim:** "Shanghai ELE ***misdirected*** the Court to First Circuit law on personal jurisdiction[.] … In the face of [the Court's question as to why ELE cited a First Circuit case], Shanghai ELE ***could not make any good faith argument*** for extending, modifying, or reversing existing law such that Shanghai ELE would not be required to follow Federal Circuit authority." Tower Br. at 12-13 (emphasis added).

**THE TRUTH**: In response to the Court's question as to why ELE cited a First Circuit case, ELE responded: "[We cited the First Circuit case] [b]ecause we did not find a Federal Circuit case directly on that issue, your Honor. ***We don't dispute that Federal Circuit law applies.***" Motion to Dismiss Hearing Tr. at 23:3-7 (emphasis added). Contrary to Tower's arguments, ELE clearly did not "misdirect" the Court or lack good faith in citing the case as Tower suggests.

**Claim: "**At worst, however, the timing suggests that [ELE] may have attempted to ***bury*** the 34 pages of customer support documents by swearing one day that they did not exist, yet providing them in Chinese the next." Tower Br. at 20 (emphasis added).

**THE TRUTH:** The thirty four pages of customer feedback forms were produced in a ***separate document production consisting solely of these 34 pages*** a day after the answers to written depositions were served, and therefore were clearly not "buried" in a larger document production as Tower suggests.

Tower's efforts to affirmatively mislead this Court in hopes of obtaining its fees and costs in connection with jurisdictional discovery should not be tolerated. This is particularly so where

it is demanding "hundreds of thousands of dollars" even while remaining unwilling to even enumerate how it reached these numbers.[2]

In Magistrate Martin's Report and Recommendation regarding ELE's Motion to Dismiss (Docket. No. 80, "Report and Recommendation"), Magistrate Martin admonished ELE and its counsel for the overstatements for which Tower now seeks sanctions. In doing so, Magistrate Martin noted that he found some of ELE's behavior "troubling" and "disturbing" -- words that Tower tirelessly repeats in its brief (*five times* in all). *See* Tower Br. at 1, 5, 13, 17. Now, *three months* after the Report and Recommendation was issued, Tower comes back to Court and seeks sanctions for the same conduct about which its has already complained, the same conduct for which the Court has already admonished ELE, and in many respects the same conduct for which Tower already moved for, and been awarded, sanctions.

Simply put, enough is enough. ELE has provided extensive and detailed discovery and information concerning a wide array of issues as to its operations. In its good faith efforts to do so, it made a handful of misstatements which the declarations of Long Zhang and Barkley Bao (attached hereto as Exhibits B and C) confirm were nothing more than honest mistakes. Every statement ever made by ELE to this Court was believed to be true at the time it was made, and

---

[2] Through ELE's attempts to resolve the issues raised by Tower's latest sanctions motion, ELE understands that Tower is claiming that it should receive at least ***$315,000***. *See* Declaration of Joshua M. Dalton ("Dalton Decl.") at ¶ 4 (attached hereto as Exhibit A). Tower's figure of $315,000 allegedly does not include Tower's costs and fees associated with researching and drafting its opposition to ELE's Motion to Dismiss, which Tower does not purportedly seek. *Id.* ELE is at a complete loss for how Tower could conceivably have spent over $300,000 on jurisdictional discovery alone. Notably, ELE has not spent over $300,000 on the *entire case*. *Id.* at ¶ 5. Nonetheless, in hopes of furthering a settlement dialogue, ELE offered to settle this dispute for $30,000 -- which ELE viewed as more than the nuisance value of briefing and arguing the motion -- but Tower rejected that offer and refused to make a counteroffer. *Id.* at ¶¶ 7-8. Indeed, Tower's counsel responded by voicemail and stated that if ELE could not *start* the settlement discussion at "six figures," then Tower was "not interested at all." *Id.* at 8. ELE's counsel responded by email and noted that ELE was struggling to understand how Tower could claim it was entitled to fees anywhere near the $30,000 ELE had offered to settle, let alone the $300,000+ it was demanding. As such, ELE requested that Tower provide a more detailed fee claim, and specifically, to indicate what if any of the fees it was demanding were unrelated to issues already vetted by the Court or that are otherwise not properly the subject of a motion for sanctions. *See* Ex. 1 to Dalton Decl. Tower has thus far never provided the requested breakdown of its fees or otherwise responded to the questions posed in the email. Dalton Decl. at 10. Because Tower has no conceivable basis for claiming damages in a range of "six figures," let alone over $300,000, ELE has been forced to respond to Tower's Motion.

ELE's representatives deeply regret that a handful of them turned out in hindsight to be anything less than 100% accurate. ELE has taken this situation to heart, and intends to be even more careful, precise, and diligent going forward. ELE respectfully suggests that this Court’s stern admonishment to ELE in the Report and Recommendation is a sufficient sanction, and that the parties should now move on to the merits of this case. For these reasons, and those discussed herein, this motion for sanctions should be denied.

## ARGUMENT

### I. THE COURT SHOULD NOT EXERCISE ITS INHERENT POWER TO SANCTION SHANGHAI ELE ON THESE FACTS

Acknowledging that it failed to abide by the procedures set forth in Rule 11 for requesting sanctions, Tower now tries to shoe-horn its time-barred request into the Court’s “inherent power” to sanction ELE and use it to award Tower “hundreds of thousands of dollars.” Tower Br. at 1. There is no question that this Court possesses the inherent power to sanction litigation misconduct. *See, e.g., Whitney Bros. Co. v. Sprafkin*, 60 F.3d 8, 13 (1st Cir. 1995) (internal quotation marks omitted) (*quoting Chambers*, 501 U.S. 32, 45-46 (1991)) (holding that a district court may use its inherent powers to assess attorneys’ fees against a party that has “acted in bad faith, vexatiously, wantonly, or for oppressive reasons.”). Nevertheless, such powers should not be used lightly. “Before awarding sanctions under its inherent powers, however, the court must make an explicit finding that counsel's conduct ‘constituted or was tantamount to bad faith.’” *Primus Automotive Financial Services v. Batarse*, 115 F.3d 644, 648-649 (9th Cir. 1997), *quoting Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980). Indeed, the United States Supreme Court has made clear that the inherent power of the court to sanction alleged misconduct should be used sparingly. *See Chambers*, 501 U.S. at 44 (“Because of their very potency, inherent powers must be exercised with restraint and discretion.”).

Nothing at issue here merits exercise of such powers, let alone to the extreme degree requested by Tower. Tower provides no evidence to suggest that ELE or its counsel “acted in bad faith, vexatiously, wantonly, or for oppressive reasons.” As discussed below, the statements

at issue from Mr. Zhang and Mr. Bao were innocent mistakes. Each believed their statements to be true and accurate at the time they made them, and none of the overstatements cost Tower any more money than it would have spent in jurisdictional discovery absent the statements. Accordingly, ELE should not be sanctioned for those statements. Likewise, Tower's request for the Court to exercise its inherent power and sanction ELE for the arguments that it made concerning the applicable jurisdictional law is baseless. ELE's jurisdictional arguments were entirely proper and are not sanctionable.

### A. The Overstatements by Mr. Zhang in his Declaration Do Not Justify Sanctions

On or about November 16, 2006, Mr. Zhang signed a declaration that was submitted in support of ELE's Motion to Dismiss (the "Declaration"). The Declaration was Mr. Zhang's first personal involvement in United States litigation. *See* Second Declaration of Long Zhang ("Zhang 2d Decl.") at ¶ 2. While Tower admits that "the record does not show that Mr. Zhang *knew* Shanghai ELE sold to U.S. customers at the time Mr. Zhang executed his declaration," Tower argues that as its CEO, Mr. Zhang somehow *should have known* that ELE's LCDIs were being sold to U.S. customers. Tower Br. 7 (emphasis added).

It is undisputed that Mr. Zhang did not misstate any of ELE's direct contacts (or lack thereof) specifically with the State of Rhode Island. Only after and through ELE's extensive search for, and review of, documents and information in response to Tower's discovery requests in 2007, did ELE learn that the 2006 Declaration overstated ELE's lack of sales of LCDIs and GFCIs directly into the United States as a whole. Zhang 2d Decl. at ¶ 4. Specifically, while confirming that "[t]here are two types of Shanghai ELE's products that are currently sold in the United States markets," the 2006 Declaration indicated that those products did not come into the United States directly, but instead came to the United States only through exporters or as part of a completed product manufactured outside of the United States. *Id.* at ¶ 5. Although those statements would have been accurate as to ELE's shipments to Rhode Island directly, Mr. Zhang

came to understand after the fact that the statements, as written, overstated ELE's lack of sales to the United States directly. *Id*.

As affirmed by his attached declaration, at the time Mr. Zhang signed the Declaration, he believed his statements to be completely true and accurate. Zhang 2d Decl. at ¶ 6. ELE is a privately owned manufacturer of household electrical products, with its headquarters located in the City of Shanghai, China, and other manufacturing facilities located in Jiangsu and Zhejiang Provinces, China. *Id*. When ELE began its sales of LCDI devices in December 2005, it focused its sales efforts on original equipment manufacturers ("OEMs") in China and the Far East. *Id*. Its focus was not, and has never been, on United States OEMs, and ELE did not export any LCDI devices to the United States during the first sales cycle (which lasted through early 2006). *Id*. In the following year's sales cycle (for which ELE was in the midst of at the time the Declaration was signed), ELE again focused it sales on OEMs in the Far East, and as such Mr. Zhang assumed that no sales had been made directly to the United States. *Id*. However, unbeknownst to Mr. Zhang, at the time the Declaration was signed, ELE's sales department had managed to make a small number of sales (for a total of less than a hundred thousand units out of millions sold in China) to two manufacturers in the States of Texas and New York respectively. *Id*.

Mr. Zhang and ELE had no intent to deceive this Court or Tower, nor did Mr. Zhang intend to overstate ELE's lack of contacts with the United States generally in paragraphs 10, 11, and 15 of the Declaration. Zhang 2d Decl. at ¶ 7. Rather, as the Chief Executive Officer of ELE, Mr. Zhang did not have significant involvement in the day-to day-operations, and as such was not aware of these new, low-level sales directly to the United States. *Id*. While all of Mr. Zhang's statements concerning ELE's lack of contacts specifically with the State of Rhode Island were true (including Paragraphs 3-9, 12-14, 17-19, 21-22, 24), Mr. Zhang recognizes that he should not have been so definitive in making assertions concerning ELE's lack of contacts with the United States generally. *Id*.

Notably, the overstatements by ELE did not help its cause in this case. Since GFCIs are not in any way at issue in this case, ELE's GFCI sales into the United States were irrelevant. Tower never seriously contended this to be a "general jurisdiction" case, and went on to concede -- after discovery -- that ELE did not have continuous and systematic contacts into the United States with either its GFCI or LCDI products to justify a finding of general jurisdiction.

With respect to LCDIs, ELE's LCDI sales directly into the United States represent *de minimis* percentage of ELE's worldwide LCDI sales. After the statements were made, jurisdictional discovery proceeded and facts were learned that contradicted Mr. Zhang's representations. By the time Tower opposed the Motion to Dismiss, the overstatements were well known by both parties, and Tower specifically noted ELE's direct LCDI sales in its opposition to ELE's Motion to Dismiss. *See, e.g.*, Tower Opp. to Motion to Dismiss at 10. In its reply brief, ELE acknowledged those facts, did not hide from the facts, and never relied on the overstatements. Rather, in its reply brief, ELE acknowledged the true facts, accepted those facts, and applied them to the law. Even Tower concedes that ELE applied the true facts in its reply brief. Tower Br. at 13-14 ("[ELE] flipped [the statements] into an argument that its direct U.S. Sales supported its position against Rule 4(k)(2) jurisdiction in Rhode Island.").

ELE recognizes that once it came to learn about them, it would have been better to affirmatively notify the Court of the overstatements, or at least drop a footnote in the reply brief specifically calling out the overstatements and acknowledging that it was not relying on them. Nonetheless, despite considering ELE's conduct and specifically noting Mr. Zhang's overstatements, Magistrate Martin did not sanction ELE for the overstatements or ELE's failure to correct the statements. Instead, Magistrate Martin publicly admonished ELE for failing to correct the statements. ELE and its counsel respect the public admonishment and do not take it lightly. In view of the public admonishment, ELE does not believe that further sanctions are warranted under the Court's inherent power.

Tower's arguments for the exercise of the Court's inherent power here are unavailing. Tower's reliance on *Rottlund Co., Inc. v. Pinnacle Corp.*, 22 F.R.D. 363 (D. Minn. 2004) is

misplaced, as the conduct that motivated the Court there to exercise its inherent power and sanction the defendant was far worse than that alleged here. Specifically, in *Rottlund*, in connection with a suit concerning allegedly infringing designs of townhomes in Minnesota, the defendant denied having *any contact* with the State of Minnesota, moved to dismiss for lack or personal jurisdiction and objected to participating in discovery while its motion to dismiss was pending, arguing that "[t]he Court should deny Rotlund's request *to go fishing for non-existent facts relating to jurisdiction*." *Id.* at 378 (emphasis in original). Despite these arguments, during discovery the defendant produced a file the defendant referred to as "a great big file called Minnesota," which "demonstrated that [defendant's] *architect was heavily involved in designing the allegedly infringing townhomes in Minnesota*." *Id.* at 365, 377 (emphasis in original). Indeed, it was subsequently learned that defendant's in-house counsel received the Minnesota file twenty days before oral argument on the motion to dismiss -- an argument where defendant again asserted that "*there is no evidence that [defendant] actually designs,* builds, or sells *homes in Minnesota*[.]". *Id.* at 378 (emphasis in original). In view of information learned in discovery, the Court found that "had [this information] been disclosed to outside counsel, the motion to dismiss for lack of personal jurisdiction most likely would not have even been filed; thus relieving Rottlund of all fees and costs incurred." *Id.* at 379.

The same can not be said here. ELE did not misrepresent any facts related to its contacts with Rhode Island specifically, and had Mr. Zhang identified the handful of sales of LCDIs to Texas and New York, the motion to dismiss clearly would still have been filed. Indeed, Tower does not even purport to seek its fees in connection with having to oppose the motion to dismiss. Moreover, in *Rottlund* even in view of "[defendant's] troubling pattern of conduct involving the abuse of the judicial process, discovery incompetence, and defiance of Court orders, not to mention periodic episodes of brazen disrespect to the Court and an instance of cowardly

harassment during a deposition," the Court only awarded plaintiff $4,492.70 as a sanction for the alleged misrepresentations in the motion to dismiss pleadings.[3] *Rottlund*, 22 F.R.D. at 364.

Tower also cannot seriously contend that the innocent mistakes made in this case are analogous to the extreme misconduct that occurred in *Qualcomm Corp. v. Broadcomm Corp.*, No. 05-1958, 2008 WL 66932 (S.D. Cal. 2008). There, the Court sanctioned Qualcomm and its attorneys *$8.5 million* for committing "incredible discovery violation[s] by *intentionally hiding* or *recklessly ignoring* relevant documents, ignoring or rejecting numerous warning signs that Qualcomm's document search was inadequate, and blindly accepting Qualcomm's unsupported assurances that its document search was adequate." *Id.* at *18 (emphasis added). In *Qualcomm*, the defendant failed to produce "forty-six thousand documents (totaling more than three hundred thousand pages), which had been requested but not produced in discovery." *Id.* at 6. Here, ELE and its counsel's conduct in no way rises to the level of conduct perpetrated by Qualcomm and its attorneys. ELE's counsel meticulously walked through Mr. Zhang's Declaration paragraph by paragraph and assuredly pushed for documents throughout the jurisdictional discovery phase. Unless Tower is suggesting that counsel was required to fly to China to personally audit ELE's financials, ELE's counsel did everything it should have done to vet the accuracy of the initial statements. ELE and its counsel certainly did not "intentionally" deceive Tower or this Court.[4]

---

[3] In *Rottlund*, the plaintiff had moved for sanctions under Rule 11 after the motion to dismiss, but the Court denied that motion and refused to revisit its Rule 11 ruling. *Id.* at 366-67. Nonetheless, the Court found that defendant's pattern of misconduct, including the misconduct from its lack of candor during the motion to dismiss, warranted sanctions under the Court's inherent power.

[4] Tower's reliance on *Meridith, Inc. v. Marketing Resources Group of Oregon, Inc.*, 2005 WL 2334294 (E.D. Mo. 2005) and *Kraemer Export Corp. v. Peg Perego U.S.A., Inc.*, 1994 WL 86357 (S.D.N.Y. 1994) for the proposition that the Court should sanction ELE under Rule 11 is also misplaced. In *Meridith*, the plaintiff moved under Rule 11 for sanctions in connection with defendants' assertion that they did not have any contact with the plaintiff *in Missouri* (i.e., the subject forum). Even in view of the misrepresentation concerning contacts with the subject forum, the Court only awarded sanctions against each defendant in the amount $4,000 ($1,500 each to be paid to the plaintiff and $2,500 to be paid to the Court). *See Meridith, Inc.*, 2005 WL 2334294 at *5. Similarly, in *Kraemer*, the Court sanctioned the defendant under Rule 11 for misrepresenting that it did not have an office *in New York* (*i.e.*, the subject forum). Again, here, ELE did not overstate any facts related to its contacts with Rhode Island and the overstatements that were made did not cost Tower any more money than it would have spent regardless. "[C]ourts ought not invoke Rule 11 for slight cause; the wheels of justice would grind to a halt if lawyers everywhere were sanctioned every time they made unfounded objections, weak arguments, and dubious factual claims. *Young v. City*

(Footnote Continued on Next Page.)

Accordingly, the Court should deny Tower's request for the Court to exercise its inherent power to sanction ELE for the overstatements made by Mr. Zhang.

### B. The Minor Inconsistency Noted in Mr. Bao's Answers to Written Deposition Questions Does Not Justify Sanctions

Repeating arguments that it made in its opposition to ELE's Motion to Dismiss (*see* Opp. Br. at 11), Tower points to a *single* customer support feedback form indicating quality control problems that LG had with certain LCDI devices, and argues that ELE mislead Tower and the Court because that single feedback form produced by ELE a day after ELE served Mr. Bao's answers to the 141 written deposition questions contradicts a select few answers to the written deposition questions. Specifically, Tower asked in Question 27: "To what customer or customers did Shanghai ELE provide customer support regarding a 'technical problem'?" Mr. Bao responded to Question 27 as follows: "After a duly diligent review of our customer support feedback forms, I have not located records of any instances in which such support was provided to any LCDI customer." In Question 30, Tower asked: "For each customer listed in response to question 27, list all individuals with which Shanghai ELE had contact regarding such customer support." Mr. Bao responded to Question 30 as follows: "After a duly diligent review of our customer support feedback forms, I have not located records of any instances in which such support was provided to any LCDI customer. In general, Shanghai ELE does not record the name of the individual seeking customer support." Second Declaration of Barkley Bao ("Bao 2d. Decl.") at ¶ 8. Tower asked similar questions concerning customer support and customer service generally and business problems, transports problems, and storage problems specifically. *Id.*

Tower asked 141 detailed questions, including dozens that related to customer interactions that made subtle distinctions between customer support, customer service, business

(Footnote Continued from Previous Page.)

*of Providence ex. Rel. Napolitano*, 404 F.3d 33, 39-40 (1st Cir. 2005) (setting aside Rule 11 sanctions, vacating sanction and admonition, and declining to award any costs to moving party).

problems, technical problems, transportation problems, delivery problems, and others. The document to which Tower refers (ELE-TRC000793) as contradicting Mr. Bao's answer to Question 30 relates to products with quality control problems that were returned by LG's factory in China. *Id.* at ¶ 10. Apparently these LCDIs were assembled in air conditioner units by LG's factory in China and then shipped to the United States to be sold, but were returned back from the U.S. due to quality control problems. *Id.* Mr. Bao did not understand that feedback form, or any of the feedback forms, to be related to "technical problems," a term that he understood at the time of answering the 141 written deposition questions to mean something like design defects or problems that require technical support from ELE to the air conditioner manufacturers. *Id.* In response to quality control complaints by air conditioner manufacturers, the issues were internally resolved within ELE, and sometimes ELE would replace the LCDIs returned by the air conditioner manufacturers with replacement LCDIs. *Id.* The responses, in short, were nothing more than a good faith attempt to fairly and accurately answer the (quite precise and narrow) questions posed.

Mr. Bao served as the point person for ELE in connection with its efforts to collect documents and information in response to Tower's discovery requests, and he personally reviewed the customer feedback forms before responding to the written deposition questions. Bao 2d. Decl. at ¶ 2, 11. Notably, when Mr. Bao reviewed the customer feedback forms, he noted that they were all in Chinese and therefore assumed they were all records related to air conditioner manufacturers in China. *Id.* at ¶ 11. Prior to preparing the responses, Mr. Bao conferred by telephone with counsel and discussed each of the 141 written deposition questions and answers one by one. Bao 2d. Decl. at ¶ 6. At the time that Mr. Bao answered the 141 written deposition questions, he did not believe that any of his answers contradicted the feedback forms. Bao 2d. Decl. at ¶ 11.

In light of the myriad different sub-questions posed to Mr. Bao, ELE does not believe any of the answers contradict the feedback forms. To the extent the Court believes that they do, ELE certainly had no intent to deceive Tower or the Court. Indeed, as reflected by ELE's production

of the customer feedback forms the day after serving the answers to the written deposition questions, ELE plainly had no intent to deceive Tower in responding to the 141 written deposition questions. Bao 2d. Decl. at ¶¶ 7, 12. Moreover, contrary to Tower's claims, ELE did not "bury" the customer feedback forms. The customer feedback forms that purport to contradict Mr. Bao's testimony were produced in a *separate document production consisting solely of the customer feedback forms*. *Id*. There clearly was no intent to deceive by giving an answer to a question one day and producing documents that arguably contradict that answer the next day. Specifically separating the customer feedback forms into their own separate production is not "burying" the documents, and if anything, ELE's separate production of the documents shows its good faith efforts *not* to hide the feedback forms. Accordingly, the Court should not exercise its inherent power to sanction ELE for an arguable inconsistency in Mr. Bao's answers to the written deposition questions.

For the same reasons as well as counsel's significant efforts to gather the information at issue, sanctions under Rule 26(g) are also improper. Rule 26(g) "imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rule 26 through 37." Fed. R. Civ. P. 26(g), adv. Comm. notes 1983 amendments. While the rule encourages sanctions[5] where counsel or a party makes a faulty response after failing to conduct a reasonable inquiry, what constitutes a reasonable inquiry depends on the "totality of the circumstances." Fed. R. Civ. P. 26(g), adv. Comm. notes 1983 amendments. Importantly, counsel "may rely on assertions by the client and on communications with other counsel as long as that reliance is appropriate under the circumstances." *Id.*

Here, counsel conferred with Mr. Bao and walked through the 141 questions and answers one by one, confirming the accuracy for each. Moreover, ELE produced the alleged

[5] Rule 26(g) permits an "appropriate sanction" to be levied on "the person who made the certification, the party on whose behalf the disclosure, request, response, or objection is made, or both." The sanctions "may include an order to pay the amount of the reasonable expenses, including reasonable attorney's fees, caused by the violation." Fed. R. Civ. P. 26(g).

contradictory customer feedback forms in a separate document production the day after serving the answers to written deposition questions. There clearly was no deceptive intent on ELE or its counsel's part. Neither ELE nor its counsel understood the answers to be incorrect at the time they served them, and the steps that ELE took to confirm the accuracy of the response were certainly sufficient under the circumstances. *See Maynard v. Nygren*, 332 F.3d 462, 470 (7th Cir. 2003) (holding that attorney could not be sanctioned under rule authorizing sanctions against attorneys for certifying discovery disclosures in violation of rules, where counsel had no knowledge that discovery response was inadequate).

### C. ELE's Arguments Concerning The Applicable Jurisdictional Law Do Not Justify Sanctions

Adopting a "spaghetti approach" of throwing as many allegations against the wall as possible, Tower incredibly argues next that ELE and its counsel should be sanctioned for (1) not citing the Federal Circuit case *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994) in its initial moving brief in support of its Motion to Dismiss and (2) citing the First Circuit case *Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671 (1st Cir. 1992) in its reply brief. Both arguments are weightless.

First, *Beverly Hills Fan* was not dispositive to ELE's Motion to Dismiss. As the United States Supreme Court has made clear time and time again, it -- not the Federal Circuit -- is the final arbiter of patent disputes. The controlling authority setting forth the proper standards that the Court should consider in determining whether personal jurisdiction exists (including under a stream of commerce theory) have been established by the Supreme Court, including in the cases *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) and *Asahi Metal Industries Co. v. Superior Court of California*, 480 U.S. 102 (1987) -- all of which were cited by *Beverly Hills Fan* as setting forth the proper test for determining whether personal jurisdiction exists in a patent case and all of which were cited by ELE its initial moving brief.

This is not a case where a party obtained relief by misrepresenting the law and failing to cite controlling authority. ELE cited the proper standards for personal jurisdiction as established by the Supreme Court and applied those standards to the facts of this case. Tower opposed that motion and argued that *Beverly Hills Fan* was factually analogous to the present dispute. On reply, ELE distinguished *Beverly Hills Fan*. The *Beverly Hills Fan* case was before the Court, and both sides presented their arguments with respect to that case. While the Court ultimately concluded that *Beverly Hills Fan* was factually analogous and relied upon it in finding jurisdiction here, ELE's failure to cite the case in its initial moving brief is plainly not sanctionable conduct. *See Miera v. Dairyland Ins. Co.*, 143 F.3d 1337, 1342-43 (10th Cir. 1998) (holding that attorney's failure to cite dispositive federal case holding was not so unreasonable as to warrant holding attorney personally liable for costs and attorney fees). In essence, Tower is arguing that because ELE did not agree with Tower's application of *Beverly Hills Fan*, ELE should be sanctioned. That clearly is not the law.

Second, Tower wholly misrepresents the facts in arguing that "ELE ***misdirected*** the Court to First Circuit law on personal jurisdiction" Tower Br. at 12 (emphasis added). Specifically, Tower claims that after misdirecting the Court:

> ELE then continued to argue the incorrect law, including at the hearing on the Motion to Dismiss, where Magistrate Judge Martin specifically noted this issue by asking Shanghai ELE's Counsel: '[w]hy do you cite Boit versus Gar-tech Products, a First Circuit Case…?' (Motion to Dismiss Hr'g Tr. 22:19-21, attached as Ex. B to Bifano Dec.). In the face of this question, Shanghai ELE could not make any good faith argument for extending, modifying, or reversing existing law such that Shanghai ELE would not be required to follow Federal Circuit authority. Instead, it misdirected the Court by incorrectly implying that it was Tower who had cited the incorrect law in Tower's Rule 4(k)(2) arguments. … Rather than charging Tower with off-point legal research, Shanghai ELE should have properly investigated the law before filing and arguing its Motion to Dismiss.

Tower Br. at 12-13. A review of the hearing transcript reflects that Tower's assertions are baseless. In response to the Court's question as to why ELE cited the First Circuit case, counsel responded:

> [We cited Boit] [b]ecause we did not find a Federal Circuit case directly on that issue, your Honor. We don't dispute that Federal Circuit law applies. And by the

> way, I would add, that if you notice in their papers when they get to 4(k)(2), they start coming back to -- they argue First Circuit law applies.

Motion to Dismiss Hearing Tr. at 23:3-7. Contrary to Tower's assertions, ELE confirmed, as it stated in its moving papers, that it did not dispute that Federal Circuit law applies. Thus, ELE did not misdirect the Court to First Circuit law. Rather, ELE cited a First Circuit case instead of a Federal Circuit case because it did not find a Federal Circuit case with such clear language on the indisputable point it was asserting, namely that "mere awareness that a product may end up in the forum state does not constitute 'purposeful availment.'" Furthermore, contrary to Tower's assertions, in response to Tower's claim that ELE's counsel "charg[ed] Tower with off-point legal research," ELE never claimed that Tower cited *Boit* in support of its Rule 4(k)(2) arguments. Rather, ELE correctly noted that Tower cited First Circuit case law in connection with its Rule 4(k)(2) arguments.

In the final analysis, Tower has set forth no evidence to suggest that ELE acted in bad faith sufficient for the Court to exercise its inherent power to sanction, and has only managed to rehash old issues and skew and exaggerate the facts in its attempt to do so. Tower's request for sanctions pursuant to the Court's inherent power should be denied.

## II. ELE AND ITS COUNSEL SHOULD NOT BE SANCTIONED UNDER 28 U.S.C. § 1927

Tower's request for sanctions under 28 U.S.C. § 1927 is largely duplicative of its first motion for sanctions filed in connection with ELE's alleged discovery abuses, and therefore to the extent those issues have been vetted and ruled upon by the Court, they should not be revisited. In order to recover attorneys' fees pursuant to 28 U.S.C. § 1927, "an attorney's conduct must multiply the proceedings and be 'unreasonable and vexatious' to warrant the imposition of sanctions." *Cruz v. Savage*, 896 F.2d 626, 631 (1st Cir. 1990). "Courts should … exercise [their sanctioning power pursuant to § 1927] only in instances of a serious and studied disregard for the orderly process of justice." *Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3d Cir. 1986). "[M]erely unintended, inadvertent, and negligent acts will not support an imposition of sanctions under section 1927." *Cruz*, 896 F.2d at 613 (affirming award of $3,000 sanction as a

result of plaintiff's pursuit of frivolous claims and sanctioning plaintiff $1,000 for appealing the sanctions order); *see also In re 680 Fifth Ave. Associates*, 218 B.R. 305, 322-23 (Bkrtcy. S.D.N.Y. 1998) (denying request for sanctions under § 1927 where attorney's misstatement was apparently the result of confusion, and not of any improper purpose such as delay or harassment, and did not lead to increased proceedings).

Here, ELE and its counsel did not unreasonably or vexatiously multiply the proceedings. Notably, Tower is not complaining about the result of the motion to dismiss (*i.e.*, because it won the motion) or that Tower had to research and draft an opposition to the motion (*i.e.*, as Tower does not suggest that ELE was somehow not entitled to move to dismiss the case), so the sole question at issue in Tower's motion for sanctions under § 1927 is simple: what costs and fees, if any, would have been saved if the alleged overstatements and inaccuracies never occurred? As detailed in Sections A through H below, there is no category of costs or fees that Tower can contend were the result of Mr. Zhang's statements about a lack of direct U.S. Sales of LCDI and GFCI devices or the ambiguities raised by a single customer feedback form as compared with Mr. Bao's answers to deposition questions. Accordingly, ELE did not "multiply the proceedings," and Tower's request for sanctions under § 1927 should be denied.

**A. *Jurisdictional Discovery (Generally)***

Tower cannot in good faith claim that it should be awarded its costs and fees for jurisdictional discovery generally. There is no dispute that ELE's LCDI sales are and have always been overwhelmingly to Far East manufacturers. The notion that an initial affidavit that said there were a "handful" of United States sales outside Rhode Island (as opposed to an affidavit that said there were "no" sales in the United States) would have resulted in any less jurisdictional discovery is simply not credible. If anything, Tower's pattern of aggressive behavior to date proves that Tower would have by no means simply taken ELE's word for it -- a point that Tower even acknowledges in its most recent sanctions motion. *See* Tower Br. at 17.

Tower apparently ignores that as the plaintiff, it bears the burden of proving the court's personal jurisdiction over ELE. *See Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 674-75 (1st Cir.

1992). Here, the statements at issue from the Zhang declaration (*i.e.*, that ELE did not sell LCDIs to U.S. customers or sell GFCI's to U.S. customers) were ***not*** relevant to the basis on which the Court found jurisdiction. The basis for jurisdiction was a stream of commerce theory that ELE sold LCDIs to foreign manufacturers with an inferred knowledge that those products would end up in Rhode Island. The sale of products outside the United States that ended up in the United States was never disputed, and Tower had the burden of establishing that inferred knowledge regarding Rhode Island. Therefore Tower clearly would have had to conduct discovery regarding ELE's sales of its LCDI devices regardless of the overstatements by Mr. Zhang.

Accordingly, Tower is not entitled to its costs and fees associated with all jurisdictional discovery.

**B. *Opposing ELE's Motion for Protective Order***

Tower cannot in good faith claim that it should be awarded it costs and fees associated with opposing ELE's Motion for Protective Order (Docket No. 22). As discussed in detail in that moving brief, on December 14, 2006, almost a week after Tower propounded its written discovery requests, Tower faxed a Notice of Deposition pursuant to Rule 30(b)(6). The Notice of Deposition was limited to a single topic, namely ELE's "customer support center" in America, based on a statement on ELE's website. The Notice of Deposition further stated that the deposition was to occur in ***Boston, Massachusetts*** at Tower's counsel's office. In the cover letter enclosing the Notice of Deposition, Tower stated that it would be "willing to discuss a mutually convenient ***U.S. location*** and date for the deposition." Believing the deposition notice to go well beyond the scope of discovery allowed by the Federal Rules of Civil Procedure, ELE filed the Motion for Protective Order on December 22, 2006.

On January 22, 2007, the Court held a hearing on ELE's Motion for a Protective Order. Notably, once Tower's counsel was given an opportunity to speak, in response to the Court's suggestion that the deposition occur in China, Tower's counsel quickly offered to conduct the deposition in China and informed the Court of his law firm's two facilities in China. On

February 5, 2007, the Court entered an Order, which was drafted by Tower, denying ELE's Motion for a Protective Order and authorizing Tower to conduct a deposition of ELE's witness "at a mutually convenient time and place in the People's Republic of China, in a location as close as practicable to Shanghai." *See* February 5, 2007 Order (Docket No. 40) (the "February 5 Order").

Given that the Court agreed with ELE that the deposition should not proceed in Boston, it clearly was not bad faith for ELE to file its Motion for Protective Order, and therefore, Tower should not be awarded any fees in connection with this motion.

**C. *Moving to Compel Discovery against ELE***

Tower cannot in good faith claim that it should be awarded it costs and fees associated with moving to compel discovery against ELE (Docket No. 27). On January 8, 2007, while ELE's Motion for Protective Order was pending, Tower filed a Motion to Compel discovery, specifically seeking further responses from ELE in response to Tower's First Set of Interrogatories and First Request for Production of Documents. On March 16, 2007, the Court issued an Order concerning Tower's Motions to Compel discovery. Notably, the Court *denied* in part Tower's motion and painstakingly rewrote most of Tower's interrogatories and requests for production to limit their scope. *See* March 16 Order Granting In Part Plaintiff's Motion to Compel Discovery (Docket No. 49) (the "March 16 Discovery Order") (modifying Interrogatory Nos. 1, 2, 3, 4 and Request for Production Nos. 3, 4, 9, 10, 11, 12). The Court outright granted Tower's request with respect to only Interrogatory No. 3 and Request for Production No. 5, and the Court outright denied Tower's request with respect to Interrogatory No. 7 and held that to extent the ruling did not grant the motion, the motion was deemed denied.

Accordingly, in view of the Court's denials of Tower's Motion to Compel in many respects and rewriting of Tower's discovery requests in other respects, ELE plainly was justified in objecting to Tower's discovery as written, which necessitated Tower's Motion to Compel Discovery. As such, Tower should not be awarded any fees in connection with this motion.

**D. *Moving to Compel Compliance Concerning the Deposition in China***

Tower cannot in good faith claim that it should be awarded it costs and fees associated with moving to compel compliance with the Court's February 5 Order (Docket No. 44). After the hearing on the Motion for Protective Order, and after the Court entered the February 5 Order (which was drafted by Tower), Tower determined that Chinese law did not permit deposition of Chinese citizens in Beijing or other places on the mainland of China, and therefore filed another Motion to Compel, this time seeking to have the 30(b)(6) deposition be taken in Hong Kong. Although Tower titled its motion a "Motion to Compel Compliance with the Court's February 5, 2007 Order," the Motion really sought to modify the Court's Order.

While the Court ultimately granted Tower's Motion to Compel Compliance with the February 5 Order and instructed that ELE have its Rule 30(b)(6) representative apply for permission to travel to Hong Kong for the purpose of being deposed in that city (See March 16, 2007 Order Granting Motion to Compel Compliance (Docket No. 50) (the "March 16 Compliance Order")), the Court did not suggest that ELE had any bad faith in not obtaining permits to travel to Hong Kong until after the Court ordered it to so travel. Accordingly, Tower should not be awarded any fees in connection with this motion.

**E. *Moving for Sanctions (I)***

Tower cannot in good faith claim that it should be awarded it costs and fees associated with filing its first motion for sanctions (Docket No. 56). On June 6, 2007, Tower filed a motion for sanctions against ELE. In that motion, Tower complained about numerous issues, all falling into three broad categories of conduct: (1) ELE's conduct relating to the deposition of ELE's 30(b)(6) witness; (2) ELE's responses to Tower's First Set of Interrogatories and First Request for Production of Documents; and (3) Tower's need to take, and ELE's "involvement" in, third-party discovery.

After full briefing by both parties and oral argument, on August 10, 2007, the Court issued an Order denying all but one small piece of what was requested in Tower's first Motion for Sanctions (the "Sanctions Order"). Specifically, the Court denied Tower's request for

sanctions with respect to (1) ELE filing its motion for protective order, (2) ELE's unwillingness to travel to Hong Kong in view of the language of the February 5 Order (which was drafted by Tower), (3) Tower's request for sanctions for alleged violations of the March 16 Compliance Order, (4) ELE's discovery responses, and (5) Towers need to take, and ELE's involvement with, third party discovery. The only conduct for which ELE was sanctioned was with respect to conduct during the 30(b)(6) deposition, for which the Court ordered ELE to pay Tower one-half of the cost of the Rule 30(b)(6) deposition, including one-half of the attorney's fees which were attributed to the services of Attorney John S. Cotter during that deposition. In addition, the Court granted Tower permission to take a further deposition of Mr. Bao, but the deposition was to be by written questions pursuant to Rule 31(a) and limited to the same two matters which the Court previously authorized. ELE was ordered to pay Tower's attorney's fees for preparing the questions up to a maximum of three hours time for one attorney.

The many issues that Tower already raised in its first motion for sanctions (including conduct during 30(b)(6) deposition, ELE responses to discovery requests, and Tower's third party discovery) have been vetted by the Court and should not be revisited on this second motion for sanctions.

**F. *Preparing Written Deposition Questions***

Tower cannot in good faith claim that it should be awarded further costs and fees associated with preparing the written deposition questions. On September 10, 2007, Tower served a Notice of Taking Rule 31 Deposition Upon Written Questions (the "Notice"). The Notice included 141 questions and four deposition exhibits (with accompanying Chinese translations) and provided that the deposition upon written questions of Mr. Bao would be taken before an available court reporter at the offices of Tower's counsel in Hong Kong.[6] On October 10, 2007, ELE served its answers to the 141 written deposition questions.

---

[6] On September 11, 2007, Tower sent a follow up letter stating that the Order required Mr. Bao to return to Hong Kong to answer the written deposition questions. In view of Tower's unreasonable interpretation of the Sanctions Order, ELE was forced to move the Court for clarification that the Sanctions Order did not require Mr. Bao to return

(Footnote Continued on Next Page.)

The written deposition questions, which were the result of the first motion for sanctions, have already been accounted for and therefore are not properly subject to this Motion for Sanctions.

**G. *Translating ELE Documents***

To extent Tower suggests that ELE should be sanctioned for producing documents in Chinese and that Tower was burdened by translating the documents, Tower is grossly misplaced. Case law clearly establishes that translation of documents is the requesting party's obligation. *See In re Puerto Rico Electric Power Authority*, 687 F.2d 501, 509 (1st Cir.1982) (holding that party cannot impose the cost of translating documents that exist in a foreign language on the producing party); *East Boston Ecumenical Community Council, Inc. v. Mastrorillo*, 124 F.R.D. 14, 15 (D. Mass. 1989) (holding that the party seeking depositions bear the cost of interpreters for the deponents).

The production of documents from a Chinese company in its native language of Chinese is plainly not deceptive or sanctionable.

**H. *Third Party Discovery***

To the extent that Tower asserts that ELE unreasonably caused Tower to incur the expense of third party discovery in this action and suggests that ELE's alleged non-compliance with orders of this Court caused that expense, those issues have been vetted by the Court in Tower's first motion for sanctions and should not be revisited on this motion for sanctions.

In the end, there are no categories of costs and fees that Tower expended as a result of the overstatements by Mr. Zhang and inaccuracies in Mr. Bao's answers to written deposition questions. The Court has already admonished ELE, and ELE respects that admonishment and

(Footnote Continued from Previous Page.)

to Hong Kong to answer the written deposition questions. On September 18, 2007 -- before Tower had even opposed the Motion for Clarification -- the Court granted ELE's Motion for Clarification and confirmed that Mr. Bao did not have to return to Hong Kong to answer the questions. *See* Order Granting Emergency Motion for Clarification (Docket No. 73).

does not take it lightly. While ELE recognizes that it should have been more careful in the initial declaration of Mr. Zhang and statements made subsequently thereto -- and will endeavor to check and double check the accuracy of its statements going forward -- the conduct about which Tower complains simply does not warrant sanctions.

## CONCLUSION

For the reasons stated above, it is respectfully submitted that Tower's Motion for Sanctions should be denied.

Dated: May 16, 2008

Respectfully submitted

SHANGHAI ELE MANUFACTURING CORPORATION,

By its attorneys

/s/ Lawrence T. Stanley, Jr.
Jeffrey S. Brenner (#4369)
Email: jbrenner@nixonpeabody.com
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
Phone: 401-454-1042
Fax: 401-454-1030

Of Counsel:
Tony D. Chen (*Pro Hac Vice*)
Email: tony.chen@bingham.com
Bingham McCutchen LLP
1620 26th Street, Suite 4000N
Santa Monica, CA 90404-4060
Phone: 310-225-9025
Fax: 310-907-2025

Joshua M. Dalton (*Pro Hac Vice*)
Email: josh.dalton@bingham.com
Lawrence T. Stanley, Jr. (*Pro Hac Vice*)
Email: lawrence.stanley@bingham.com
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
Phone: 617-951-8721
Fax: 617-951-8736

**CERTIFICATE OF SERVICE**

I hereby certify that on May 16, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to the registered participants as identified on the Notice of Electronic Filing (NEF) and I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the non-CM/ECF participants identified in the court's record.

/s/ Lawrence T. Stanley, Jr.
Lawrence T. Stanley, Jr.